CARL A. MORSE, INC., Respondent, v RENTAR INDUSTRIAL DE-VELOPMENT CORP. et al., Appellants, et al., Defendants.

Second Department, January 24, 1977

*Tenzer, Greenblatt, Fallon & Kaplan (Edward L. Sadowsky, Richard Kaye and Mona D. Shapiro of counsel), for appellants.*

*McGarrahan & Heard (Robert P. Walton, John G. McGarrahan, C. Stephen Heard, Jr., and Mitchell A. Gilbert of counsel), for respondent.*

*Louis J. Lefkowitz, Attorney-General (A. Seth Greenwald of counsel), in his statutory capacity under section 71 of the Executive Law.*

GULOTTA, P. J. In an action to foreclose certain mechanics' liens, and for other related relief, the appeal is from an order of the Supreme Court, Queens County, which denied appellants' motion for partial summary judgment dismissing the first cause of action. We affirm.

Under date of May 15, 1972, the plaintiff and defendant Rentar Industrial Development Corporation (Rentar) entered into a written contract for the construction of a warehouse in Queens County, New York, pursuant to which plaintiff, "the contractor", as "agent for the owner", agreed "to arrange for

all [of] the labor and materials and [to] do all [of] the things necessary for the proper construction and completion of the * * * [contemplated] building". Rentar, as "owner", agreed to compensate plaintiff in accordance with an agreed schedule of payments, whereupon the work was commenced.

Subsequently, and within the time limited by statute (Lien Law, § 10), plaintiff caused to be filed against the premises four separate mechanics' liens, totaling in excess of $1,000,000, for work, labor and services rendered pursuant to the agreement. When a dispute as to payment arose, plaintiff commenced this action, *inter alia,* to foreclose its liens, whereupon defendants moved for summary judgment dismissing the first (foreclosure) cause of action on the following two grounds: (1) that plaintiff, having contracted and performed as defendants' agent, was not a valid lienor and (2) that article 2 of the Lien Law is unconstitutional insofar as it purports to authorize the filing of a mechanic's lien without prior notice or the opportunity to be heard, thus constituting an impermissible taking of property without due process of law.

The Special Term rejected the latter contention, sustained the constitutionality of the statute and found a triable issue of fact as to plaintiff's lienor status. We are in complete agreement therewith.

Beginning with a consideration of the constitutional issue, it is appellants' contention that the creation of an interest in real property by the filing of a mechanic's lien, without prior judicial approval, constitutes an unconstitutional deprivation of property without due process of law, citing *Sniadach v Family Finance Corp.* (395 US 337); *Fuentes v Shevin* (407 US 67); *Mitchell v Grant Co.* (416 US 600); and *North Georgia Finishing v Di-Chem* (419 US 601). The Special Term agreed generally with this analysis, but held that the deprivation resulting from the filing of a mechanic's lien was *de minimis,* and therefore not such as would require prior court sanction, citing *Spielman-Fond, Inc. v Hanson's, Inc.* (379 F Supp 997 [DC Ariz, 1973], affd 417 US 901). Significantly, none of the cases cited, with the exception of *Spielman-Fond,* involved a mechanic's lien situation.

In *Sniadach,* for example, the Supreme Court of the United States held unconstitutional, as violative of due process, a Wisconsin prejudgment garnishment statute, pursuant to which a creditor could, without notice and a prior hearing, freeze up to 50% of the wages of an alleged debtor, upon

application by the creditor's attorney to the court clerk. As the Supreme Court later noted in *Mitchell v Grant Co. (supra,* p 614), it was not clear under the statute whether the debtor could immediately challenge the garnishment and thus obtain a prompt postseizure hearing, but in recognition of the obvious fact that a garnishment of wages under the Wisconsin statute involved "a specialized type of property presenting distinct problems in our economic system" which "may as a practical matter drive a wage-earning family to the wall", the court concluded that because no extraordinary circumstances justified the statutory scheme, "absent notice and a prior hearing * * * this prejudgment garnishment procedure violates the fundamental principles of due process" *(Sniadach v Family Finance Corp., supra,* pp 340-342).

Somewhat similarly, the Supreme Court, three years later in *Fuentes v Shevin (supra),* struck down, as violative of due process, the replevin statutes of Florida and Pennsylvania, again citing the absence of prior notice and a hearing. Under the replevin laws of each of those two States, a creditor was empowered to obtain a writ of replevin by the simple expedient of filing an appropriate form with the court clerk, and then posting a security bond. Under the Florida statute, anyone whose goods or chattels were "wrongfully detained" was entitled to obtain a writ, there being no statutory requirement that the applicant make a convincing showing that the goods were, in fact, being "wrongfully" detained; all that was required was that the applicant recite in conclusory fashion that he was "lawfully entitled to the possession". Under the Pennsylvania statute, a creditor was not even required to formally allege his right to possession; he had merely to file an affidavit stating the value of the property to be seized. As has heretofore been stated, the creditor, in either event, was required to file a security bond when seeking the writ, and, under either statute, the buyer could regain possession by posting a counter-bond. Under the Florida statute, the debtor would "eventually" obtain a hearing as the defendant in a repossession action (which the creditor was required to commence), but, under the Pennsylvania law, there would be no hearing unless the *debtor* commenced an action to recover possession.

Under this factual umbrella, the Supreme Court concluded that, absent extraordinary circumstances, none of which were found to be present, the Fourteenth Amendment's right to

procedural due process required due notice and an opportunity to be heard *before* a person could be deprived, even temporarily, of any possessory interest in personalty *(Fuentes v Shevin,* 407 US 67, 80-87, *supra).* Thus the court stated (p 96): "We hold that the Florida and Pennsylvania prejudgment replevin provisions work a deprivation of property without due process of law insofar as they deny the right to a prior opportunity to be heard before chattels are taken from their possessor."

The Supreme Court appeared to retreat somewhat from this position in *Mitchell v Grant Co.* (416 US 600, *supra),* decided two years later, for in *Mitchell* the majority *sustained* a Louisiana prejudgment sequestration statute which permitted a conditional vendor of personal property to obtain a writ of sequestration, ex parte, without prior notice or an opportunity to be heard. The court noted, however, that in order to obtain a writ, the creditor had to (1) file an affidavit specifying the facts he asserted in support of his claim, (2) submit the affidavit to a Judge, who was to determine its sufficiency, and (3) file a bond in order to compensate the debtor in the event of a wrongful seizure. In addition, and perhaps most importantly, the court noted that the statute provided for an immediate postseizure hearing on the question of possession, and provided further for the posting of a counter-bond, so that the debtor might regain possession in the interim. Under these circumstances, the Supreme Court opined that the requirements of due process had been satisfied, as constitutionalism did not require Louisiana to ignore the fact that, under State law, both the debtor and creditor had an interest in the subject property, *and that* the creditor's rights were subject to defeasance upon the transfer of possession. Moreover, the court noted, the creditor's security interest would be irrevocably diminished if the installment payments were not maintained so as to parallel the deterioration in the value of the property through use (416 US at pp 608-609). In short, the majority concluded (p 607) that the Louisiana statutory scheme "effects a constitutional accommodation of the conflicting interests of the [several] parties", and distinguished *Sniadach* and *Fuentes* on their facts, stating (p 609): "there is scant support in our cases for the proposition that there must be final judicial determination of the seller's entitlement before the buyer may be even temporarily deprived of possession of the purchased goods. * * * The issue at this stage of

the proceeding concerns possession pending trial and turns on the existence of the debt, the lien, and the delinquency. These are ordinarily uncomplicated matters that lend themselves to documentary proof; and we think it comports with due process to permit the initial seizure on sworn *ex parte* documents, followed by the early opportunity to put the creditor to his proof."

Finally, in *North Georgia Finishing v Di-Chem, Inc* (419 US 601, *supra),* the Supreme Court appeared to rely heavily on *Fuentes* in striking down a Georgia prejudgment garnishment statute, but did so in a manner which clearly reflected the influence of *Mitchell.* Thus, the court framed its determination as follows (pp 606-607):

"Because the official seizures [in *Fuentes]* had been carried out without notice and without opportunity for a hearing or other safeguard against mistaken repossession, they were held to be in violation of the Fourteenth Amendment.

"The Georgia statute is vulnerable for the same reasons. Here, a bank account, surely a form of property, was impounded and, absent a bond, put totally beyond use during the pendency of the litigation on the alleged debt, all by a writ of garnishment issued by a court clerk without notice or opportunity for an *early* hearing and without participation by a judicial officer.

"Nor is the statute saved by the more recent decision in *Mitchell v W. T. Grant Co.,* 416 US 600 (1974). That case upheld that Louisiana sequestration statute which permitted the seller-creditor holding a vendor's lien to secure a writ of sequestration and, having filed a bond, to cause the sheriff to take possession of the property at issue. The writ, however, was issuable only by a judge upon the filing of an affidavit going beyond mere conclusory allegations and clearly setting out the facts entitling the creditor to sequestration. The Louisiana law also expressly entitled the debtor to an immediate hearing after seizure and to dissolution of the writ absent proof by the creditor of the grounds on which the writ was issued.

"The Georgia garnishment statute has none of the saving characteristics of the Louisiana statute. The writ of garnishment is issuable on the affidavit of the creditor or his attorney, and the latter need not have personal knowledge of the facts. § 46-103. The affidavit, like the one filed in this case, need contain only conclusory allegations. The writ is issuable,

as this one was, by the court clerk, without participation by a judge. Upon service of the writ, the debtor is deprived of the use of the property in the hands of the garnishee. Here a sizable bank account was frozen, and the only method discernible on the face of the statute to dissolve the garnishment was to file a bond to protect the plaintiff creditor. There is no provision for an early hearing at which the creditor would be required to demonstrate at least probable cause for the garnishment. Indeed, it would appear that without the filing of a bond the defendant debtor's challenge to the garnishment will not be entertained, whatever the grounds may be" (emphasis supplied).

There are, as appellants contend, several similarities between the cases just cited and the facts of the case at bar. Here, as there, we have a private dispute between private parties, and the interjection of some sort of State mechanism, viz., a lien, in aid of one of the parties to the dispute. The mechanism here, as there, can be invoked upon the ex parte application of a single party, without prior notice or the opportunity to be heard, and can, as there, be invoked incorrectly, albeit in good faith. At this point, however, the similarity ends.

Unlike the petitioners in *Sniadach, Fuentes, Mitchell* and *North Georgia Finishing,* appellants herein have neither been deprived of the use or possession of their property, nor may any of their incidents of ownership, including the right of alienation, be materially altered without prior judicial approval (see Lien Law, § 24, 41). Thus, while it cannot be denied that the filing of a mechanic's lien creates a "cloud" on the owner's title, rendering alienation "more difficult", or perhaps "less profitable", the fact remains that the owner is not legally prevented from selling, encumbering, renting or otherwise dealing with the property as he chooses,[1] and, once he has found himself a ready and willing buyer, etc., there is nothing in the statute or in the nature of the lien which would preclude him from consummating the transaction. The lien, therefore, does nothing more than to impinge upon the economic interests of the owner, and in this connection it is important to note that: (1) while the value of the property may be diminished by the amount of the lien, the improvements, at least theoretically, have increased the value of the

---

1. Cf. sections 7 and 13 of the Lien Law, which attempt to protect the lienor from the owner's possible misuse of these rights to defeat his lien.

property by the amount of the lien, thus minimizing the harm; (2) the lienor is required to state, specifically and under oath, the facts giving rise to his lien (Lien Law, § 9); (3) the owner may discharge the lien by depositing the amount of the lien into court, or by posting a bond (Lien Law, §§ 19, 20, 37); and (4) the owner can compel an expeditious determination on the merits, without cost to him, by demanding that the lien be foreclosed, or the lienor "show cause * * * why the notice of lien * * * should not be vacated" upon a 30-day notice (Lien Law, § 59). Moreover, in no event can the lien remain in force for a period in excess of one year from the date of filing "unless within that time an action is commenced to foreclose the lien * * * or unless an order be granted * * * by a court of record or a judge or justice thereof, continuing such lien" (Lien Law, § 17).

It is in recognition of the foregoing minimal intrusion which results from the filing of a mechanic's lien that we conclude that due process of law in this context does *not* require prior notice or the opportunity to be heard, for, as the Supreme Court noted in *Boddie v Connecticut* (401 US 371, 378-379), "[w]hat the Constitution does require is * * * that an individual be given an opportunity for a hearing *before* he is deprived of any *significant* property interest" (accord *Fuentes v Shevin,* 407 US 67, 90, n 21, *supra; Sniadach v Family Finance Corp.,* 395 US 337, 342, *supra* [concurring opn. per HARLAN, J.]; emphasis supplied). We, however, are of the opinion that the filing of a mechanic's lien does not result in the deprivation of any "significant property interest" (accord *Spielman-Fond, Inc. v Hanson's, Inc.,* 379 F Supp 997, affd 417 US 901, *supra; Ruocco v Brinker,* 380 F Supp 432, 436 [DC, Fla, 1974, three-Judge court]; *Cook v Carlson,* 364 F Supp 24 [DC, SD, 1973]; see *Brook Hollow Assoc. v J. E. Greene, Inc.,* 389 F Supp 1322 [DC, Conn, 1975]; but, cf. *Barry Props. v Fick Bros. Roofing Co.,* 277 Md 15 [portions of the Maryland mechanic's lien law declared unconstitutional as violative of due process]; *Roundhouse Constr. Corp. v Telesco Masons Supplies Co.,* 168 Conn 371 [Connecticut's mechanic's lien law declared unconstitutional as violative of due process]), and, moreover, that the procedural safeguards incorporated into our present statute (Lien Law, § 3 *et seq)* "[effect] a constitutional accommodation of the conflicting interests of the [several] parties" *(Mitchell v Grant Co.,* 416 US, at p 607).

As Chief Judge NICHOL so cogently observed in *Cook v Carlson (supra,* pp 27-29):

"The primary purpose of the mechanics' and materialmen's lien * * * is to provide construction contractors with security. A secondary purpose, however, is to give notice to subsequent purchasers and encumbrancers that there is a charge on the property and that they will take subject to that charge. In that regard, it is similar to [a] * * * lis pendens notice. * * * The requiring of a hearing prior to the filing of [a] lis pendens * * * would destroy its effectiveness, since it would result in an interim period during which bona fide purchasers and encumbrancers could tie into the property, [thus] complicating the process of litigation and disappointing the expectations of the litigants. All of the above could also be said of the mechanics' and materialmen's lien. It is not meant to deprive the owner of possession, but to give interim protection to laborers and materialmen by giving notice of a charge on the property. * * *

"In the case of a mechanics' and materialmen's lien, where use of the property is only incidentally and partially hampered, it is [moreover] the view of this Court that there exists a basic and important public interest in [its] * * * summary imposition * * *. The mechanics' and materialmen's lien originated in the necessity of protecting the construction industry and those in its employ. Labor and materials contractors are in a particularly vulnerable position. Their credit risks are not as diffused as those of other creditors. They extend a bigger block of credit, they have more riding on one transaction, and they have more people vitally dependent upon eventual payment. They have much more to lose in the event of default. There must be some procedure for the interim protection of contractors in this situation * * * [Considering their vulnerability, a] contractor must have some protection against subsequent bona fide purchasers between the time he completes the work and the time [that] he gets a judgment."

To reiterate, we are of the opinion that New York's present statutory scheme works a constitutional accommodation of these competing interests.

In voting to uphold the current statute, we are not unmindful of the forceful and well-reasoned arguments to the contrary, as typified by the present dissent. We are mindful, however, of the serious consequences which might flow from

our invalidation of this statutory rule of longstanding,[2] and of the severe burden of proof which has been imposed upon those who would attack the constitutionality of a legislative enactment (see *Mitchell v Grant Co., supra; Fenster v Leary,* 20 NY2d 309, 314; *Matter of Van Berkel v Power,* 16 NY2d 37, 40; *Defiance Milk Prods, Co. v Du Mond,* 309 NY 537, 541). In this connection, we note, parenthetically, the following statement by Mr. Justice HOLMES in *Jackman v Rosenbaum Co.* (260 US 22, 31) and quoted by Mr. Justice BLACK in his dissent in *Sniadach (supra,* p 349): " 'The Fourteenth Amendment, itself a historical product, did not destroy history for the States and substitute mechanical compartments of law all exactly alike. If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it, as is well illustrated by *Ownbey v Morgan,* 256 U.S. 94, 104, 112.' " Under the circumstances, we are of the opinion that the requisite burden of proof has not been sustained.

In light of the foregoing, and in view of the further fact that we are in agreement with the Special Term as to the existence of a triable issue of fact as to the validity of plaintiff's lienor status, we hold that the order denying partial summary judgment should be affirmed.

SHAPIRO, J. (dissenting).

### THE ISSUE

Under the Supreme Court's decisions in *Sniadach v Family Finance Corp. of Bay View* (395 US 337), *Fuentes v Shevin* (407 US 67), *Mitchell v Grant Co.* (416 US 600), *Spielman-Fond, Inc. v Hanson's, Inc.* (379 F Supp 997, affd 417 US 901) and *North Georgia Finishing v Di-Chem, Inc.* (419 US 601), is the New York Lien Law governing mechanics' and materialmen's liens constitutional?

### THE PROVISIONS OF THE LIEN LAW

Section 3 of the New York State Lien Law provides, in relevant part, that a contractor, laborer or materialman who performs labor or furnishes materials shall have a lien for the principal and interest of the value or the agreed price of such

---

2. Our present statute is a direct descendant of the Lien Law of 1897, which, in turn, traces its roots to chapter 342 of the Laws of 1885.

labor or materials upon real property improved by such labor or materials from the time of filing a notice of such lien as prescribed in the chapter. Section 9 provides, in relevant part, that the notice of lien shall state the name and residence of the lienor; the name and address of the lienor's attorney, if he has one; the name of the owner of the real property against whose interest therein a lien is claimed, and the interest of the owner; the name of the lienor's employer or, if the lienor is a contractor or subcontractor, the name of the person with whom the contract was made; the labor done or materials furnished, and the agreed price or value thereof; the amount unpaid to the lienor; the time when the first and last items of work were performed and materials furnished; and the property subject to the lien, with a description thereof sufficient for identification. The section also requires that the notice "must be verified by the lienor or his agent, to the effect that the statements therein contained are true" (subd 7).

Section 10 provides that the notice of lien may be filed at any time during the progress of the work or furnishing of the materials, or within four months after completion of the contract or the final completion of the work or final furnishing of the materials. It also declares that the notice of lien must be filed in the clerk's office of the county where the property is situated, and that the clerk of each county shall keep a book, to be called the "lien docket", in which he shall enter the particulars of the notice and date, hour and minute of the filing of each notice.

Section 11 provides that at any time after filing the notice of lien the lienor may serve a copy of such notice upon the owner, either personally or by an appropriate method of service. The section also provides that until service of the notice has been made, an owner without knowledge of the lien shall be protected in any payment made in good faith to any contractor or other person claiming a lien, and that a failure to serve the notice does not otherwise affect the validity of the lien.

Section 13 provides, in part, that a lien for materials furnished or labor performed in the improvement of real property shall have priority over a conveyance, mortgage, judgment or other claim against such property not recorded, docketed or filed at the time of the filing of the notice of such lien, except as specifically provided in the balance of the chapter. Section 17 provides *that no lien specified in article 2*

*(dealing with mechanics' liens) shall be a lien for more than one year after the notice of lien was filed, unless within that time an action is commenced to foreclose the lien and a notice of pendency of such action is filed with the county clerk of the county in which the notice of lien is filed.*

Section 19 provides that a lien for a private improvement may be discharged by a certificate of the lienor, duly acknowledged and filed in the office where the notice of lien is filed, stating that the lien is satisfied or released, or by failure to begin an action to foreclose such lien, or to secure an order continuing it, within one year, or by order of the court canceling such lien of record for neglect of the lienor to prosecute it or, either before or after the beginning of an action, by the owner or contractor executing an undertaking with two or more sufficient sureties to the clerk of the county where the premises are situated, in such sums as the court, or a Judge or Justice thereof, may direct, not less than the amount claimed in the notice of lien, conditioned for the payment of any judgment which may be rendered against the property for the enforcement of the lien. A copy of the undertaking, with notice that the sureties will justify before the court, must be served on the lienor or his attorney not less than five days before such time. The court, upon approval of the undertaking, shall by order discharge such lien. The balance of the section provides for discharge of a lien upon a showing of a final determination of the action in favor of the owner, or if it appears from the face of the notice of lien that the claimant has no valid lien or that the notice of lien is invalid for failure of compliance with sections 9 or 10.

Section 20 provides an alternative method of discharging a lien after a notice of lien is filed, i.e., by the deposit with the county clerk of a sum of money equal to the amount claimed in the notice. Section 23 provides that the article is to be construed liberally to serve the beneficial interests and purposes thereof and that a substantial compliance with its several provisions shall be sufficient for the validity of a lien and to give jurisdiction to the courts to enforce the same.

Section 37 provides that any "owner or contractor between whom a contract exists for the improvement of real property may", before or after the commencement of the improvement, execute a bond to the county clerk in such amount as the Judge may direct and that, upon approval of any such bond by the court and the filing of the bond with the county clerk, the

court shall notice an order discharging such property from the lien of every contractor, subcontractor, laborer or material-man performing labor or furnishing materials in connection with the performance of the contract described in the bond. Section 39 provides that in any action or proceeding to enforce a mechanic's lien, or in which the validity of the lien is an issue, if the court finds the lienor has willfully exaggerated the amount for which he claims a lien as stated in his notice of lien, his lien shall be declared to be void and no recovery shall be had thereon.

Section 59 of article 3 of the Lien Law provides that a "mechanic's lien notice of which has been filed on real property or a bond given to discharge the same may be vacated and cancelled or a deposit made to discharge a lien pursuant to section twenty may be returned, by an order of a court of record", but that before such an order may be granted, a notice must be served on the lienor requiring him to commence an action to enforce the lien within a time specified in the notice, not less than 30 days from the time of service, or show cause why the notice of lien filed or the bond given should not be vacated or the deposit returned.

### THE DUE PROCESS REQUIREMENT OF THE FOURTEENTH AMENDMENT

Mr. Justice WEINSTEIN, in his opinion holding that the appellants had failed to sustain their burden of establishing that the Lien Law, as applied to their real property, was unconstitutional, summarized the law established by *Snia-dach, Fuentes, Mitchell* and *North Georgia Finishing* as follows: "For a prejudgment seizure to be valid there must be a factual demonstration by the party seeking the seizure of the nature, extent and validity of his claim to a judicial authority empowered to grant or deny the seizure and an opportunity for an expeditious adversary adjudication of the claim either prior to or shortly after the seizure. *(Mitchell v W. T. Grant Co.,* 416 US 600, 611-17; see *North Georgia Finishing, Inc. v Di-Chem, Inc.,* 419 US 601, 42 L Ed 2d 751, 757.) Procedurally, the Lien Law does not meet this standard. A mechanic's lien may be acquired by the parties filing notice thereof without any prior approval. (Lien Law, §§ 3, 10.) The failure to notify the owner does not in itself invalidate the lien. (Lien Law, § 11.) The fact that the lien may be vacated for defects upon its face (Lien Law, § 19), upon the posting of a bond or

undertaking (Lien Law, §§ 19, 20), or upon general grounds of invalidity in an action to enforce it, does not satisfy the previously stated procedural requirements. *(Fuentes v Shevin, supra,* at 80-82, 84-85.)" Yet despite the foregoing statement that the Lien Law "does not meet" the standard established by the due process requirement of the Fourteenth Amendment as interpreted in the *Sniadach, Fuentes, Mitchell* and *North Georgia Finishing* cases, Mr. Justice WEINSTEIN concluded, and the majority of this court agrees, that because the owner's use and possession of, "including the right to alienate", real property subject to a mechanic's lien can in no way be affected without court approval, there is no "total deprivation of those rights"—the test, as set forth by him, of those four decisions— the Lien Law, as applied to real property, is constitutional.

In *Fuentes* (407 US 67, 86, *supra)* the Supreme Court said: "The Fourteenth Amendment's protection of 'property,' how- ever, has never been interpreted to safeguard only the rights of undisputed ownership. Rather, it has been read broadly to extend protection to 'any significant property interest,' *Boddie v Connecticut,* 401 US, at 379, including statutory entitle- ments." Hence, while in *Fuentes* the appellants were deprived of their interest in the continued possession and use of the goods replevied, which they held under conditional sales con- tracts and to which they lacked full title, and in *Sniadach* the plaintiff lost the use of the garnisheed portion of his wages, there was no need, as a condition of invoking their right to due process under the Fourteenth Amendment prior to such impairment of that right, for them to be subjected to a "total deprivation of those rights", as the Special Term declared in its memorandum in support of the order appealed from.

But even accepting the less stringent test of impairment of "any significant property interest" as the one applicable, we must still examine the precedents to see whether the filing of a mechanic's lien affecting real property under the New York statute does, in reality, amount to impairment of such a "significant property interest". In *Spielman-Fond, Inc. v Han- son's, Inc.* (379 F Supp 997), a three-Judge constitutional court, faced with the question of whether the Arizona statutes relating to mechanics' and materialmen's liens were in viola- tion of the due process clause of the Fourteenth Amendment, distinguished *Fuentes* and *Sniadach* on the ground that they involved an actual taking of property, whereas the case before the court presented "no actual taking of possession of any

kind from plaintiffs" *(supra,* p 999), who remained in possession of their land and continued to rent mobile homes to the tenants, who were unaware of the lien claims. The court rejected plaintiffs' claim that since the lien clouded title and could "in many situations amount to an absolute prohibition on the right to alienate property" (p 999), it was a deprivation of a significant property interest. The court said (p 999): "It cannot be denied that the effect of such lien may make it difficult to alienate the property. If the plaintiffs can find a willing buyer, however, there is nothing in the statutes or the liens which prohibits the consummation of the transaction. Even though a willing buyer may be more difficult to find, once he is found there is nothing to prevent plaintiffs from making the sale to him. The liens do nothing more than impinge upon economic interests of the property owner. The right to alienate has not been harmed, and the difficulties which the lien creates may be ameliorated through the use of bonding or title insurance." The court concluded "that the filing of a mechanics' and materialmen's lien does not amount to a taking of a significant property interest" (p 999) and that the Arizona statute was therefore not violative of the due process requirement.

*Spielman-Fond, Inc. v Hanson's, Inc.* was affirmed *without opinion* by the Supreme Court of the United States (417 US 901 [May 28, 1974]), and this was cited by the Special Term to support its conclusions that "the 'interest' acquired by a mechanic's lien is not such as requires court sanction prior to its filing" and "[t]he fact that the owner's right to sell or mortgage the realty may be made more difficult does not change the result", but in doing so the Special Term gave undue weight to that affirmance for, as Chief Justice BURGER said in his concurring opinion in *Fusari v Steinberg* (419 US 379, 391-392): "When we summarily affirm, without opinion, the judgment of a three-judge District Court we affirm the judgment but not necessarily the reasoning by which it was reached. An unexplicated summary affirmance settles the issues for the parties, and is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument. Indeed, upon fuller consideration of an issue under plenary review, the Court has not hesitated to discard a rule which a line of summary affirmances may appear to have established."

In *Bay State Harness Horse Racing and Breeding Assn. v*

*PPG Inds.* (365 F Supp 1299 [DC, Mass, 1973; three-Judge court]), *Gunter v Merchants Warren Nat. Bank* (360 F Supp 1085 [DC, Me, 1973; three-Judge court]), *Clement v Four North State St. Corp.* (360 F Supp 933 [NH, 1973; three-Judge court]) and *Idaho First Nat. Bank v Rogers* (41 US Law Week 2492 [DC, Idaho, 1973]), statutes similar to ours were held to be unconstitutional. The first three of these cases struck down as unconstitutional, under *Sniadach* and *Fuentes,* State statutes allowing prejudgment real estate attachments in actions commenced in State courts. In the fourth, the decision in the Federal District Court in Idaho (COGSWELL, J.), fails to specify which statute is involved, but the court there read *Fuentes* as expanding the rule of *Sniadach* by stating that principles of due process cannot be applied on the basis of the distinction between different kinds of property. It declared that the Supreme Court, in *Fuentes,* had rejected the idea that *Sniadach* was predicated solely on the importance of wages and suggested that it was applicable to all property whose use was restricted to any degree. Noting that in the case before him the defendant was in physical possession of the real property, Judge COGSWELL said (p 2492): "However, an attachment tends to restrict the use of that property for security on any financial dealings and to restrict the sale or encumbrance of the same without first obtaining a release of the attachment. In order to obtain a release a defendant must make an application to the court and incur the necessary expense to post a bond in accordance with the state code. The deprivation of a property interest may only be temporary but, as stated in *Fuentes,* 'a temporary non-final deprivation of property is nonetheless a deprivation in terms of the Fourteenth Amendment.' [407 US 67, 85]."

In *Barry Props. v Fick Bros. Roofing Co.* (277 Md 15, 31), the Court of Appeals of Maryland declared: "In short, the Maryland mechanics' lien law permits an owner to be deprived of a significant property interest without notice or a prior hearing, and thus is unconstitutional unless it provides protections such as those discussed in *Mitchell [Mitchell v Grant Co.,* 416 US 600] and *North Georgia Finishing* [419 US 601] or it is deemed to be within the 'extraordinary circumstances' exception."

The Court of Appeals then invoked its power under a Maryland law permitting severability of statutes to preserve their constitutionality and, under the authority of that stat-

ute, excised the provisions of the Maryland mechanics' lien law which imposed the lien from the time the work was done and ruled that there could be no lien on the subject property until the claimant prevailed, either in a suit to enforce the claimed lien or in some other appropriate proceeding providing notice and a hearing. The court also struck down the statutory provision giving mechanics' liens priority over any mortgage, judgment or encumbrance on the building or ground subject to such lien imposed thereon subsequent to the commencement of the building but before the time the lien was established by a judicial determination.

In *Roundhouse Constr. Corp. v Telesco Masons Supplies Co.* (168 Conn 371), the Supreme Court of Connecticut struck down the Connecticut statutory procedure governing mechanics' liens as unconstitutional because it did not comply with the due process of law requirements of the Fourteenth Amendment and of the Connecticut Constitution. In so doing, it rejected the *de minimis* contentions advanced in *Cook v Carlson* (364 F Supp 24), and said (p 383):

"Most conspicuously absent from the Connecticut procedure is any provision whatsoever for any sort of a timely hearing, either before or after the recording of the lien, which would give the property owner an opportunity to be heard or require the lienor to justify his lien. The statutes allow the lien to continue for two years without any further action on the part of the lienor, during which time the owner of the property is without recourse in the courts to contest the merits of the claim underlying the lien."

These rulings, however, do not deal with that part of the holding of *Fuentes* which rejected the view that *Sniadach* was limited to deprivation of wages and to deprivation of possession and use of property and that *Sniadach* and *Goldberg v Kelly* (397 US 254), "as a matter of constitutional principle, established no more than that a prior hearing is required with respect to the deprivation of such basically 'necessary' items as wages and welfare benefits" *(Fuentes v Shevin,* 407 US 67, 88, *supra).* In *Fuentes,* the court said (pp 88-89): "This reading of *Sniadach* and *Goldberg* reflects the premise that those cases marked a radical departure from established principles of procedural due process. They did not. Both decisions were in the mainstream of past cases, having little or nothing to do with the absolute 'necessities' of life but establishing that due process requires an opportunity for a hearing before a depri-

vation of property takes effect. * * * In none of those cases did the Court hold that this most basic due process requirement is limited to the protection of only a few types of property interests. While *Sniadach* and *Goldberg* emphasized the special importance of wages and welfare benefits, they did not convert that emphasis into a new and more limited constitutional doctrine. Nor did they carve out a rule of 'necessity' for the sort of nonfinal deprivations of property that they involved."

It is clear from the foregoing that the order here appealed from is without basis in law insofar as it depends for its validity on the legal proposition that the deprivation of property resulting from the filing of a mechanic's lien against real property is *de minimis* and therefore not sufficient to invoke the safeguards of Fourteenth Amendment procedural due process. But, after disposing of the untenable *de minimis* theory, there still remain several questions. First, there is the question of whether the Lien Law's provisions governing mechanics' liens involve what the Supreme Court of the United States, in *Fuentes,* called " 'extraordinary situations' " which it said might "justify postponing notice and opportunity for a hearing" (407 US, at p 90). In stating that possible exception, that court said (pp 90-92): "These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State had kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. Thus, the Court has allowed summary seizure of property to collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, and to protect the public from misbranded drugs and contaminated food."

In *Cook v Carlson (supra,* pp 28-29), the court, in addition to basing its ruling on a finding that *Sniadach* and *Fuentes* were inapplicable to the South Dakota mechanic's lien law because the property deprivation to the lienee was *de minimis,* also declared: "I conclude, also, especially in the light of the

insignificant nature of the deprivation, that the situation giving rise to the mechanics' and materialmen's lien is an 'extraordinary situation' justifying the attachment of the lien as soon as the first materials or labor are furnished. I think this is a case 'requiring special protection to a * * * creditor interest', and where the statute is 'narrowly drawn to meet * * * such unusual conditions.' Sniadach v̇ Family Finance Corp., 395 US 337, 339 * * *. I think this is a case where 'prompt action' is 'directly necessary to secure an important government or general public interest.' Fuentes v Shevin, 407 US 67, 91 * * *. In the case of a mechanics' and materialmen's lien, where use of the property is only incidentally and partially hampered, it is the view of this Court that there exists a basic and important public interest in the summary imposition of the lien. The mechanics' and materialmen's lien originated in the necessity of protecting the construction industry and those in its employ. Labor and materials contractors are in a particularly vulnerable position. Their credit risks are not as diffused as those of other creditors. They extend a bigger block of credit, they have more riding on one transaction, and they have more people vitally dependent upon eventual payment. They have much more to lose in the event of default. There must be some procedure for the interim protection of contractors in this situation. A contractor must have some protection against subsequent bona fide purchasers between the time he completes the work and the time he gets a judgment. Considering their vulnerability, and especially considering their importance to the stability of the American economy, I think there exists sufficient justification for the South Dakota statutory scheme which creates a lien as a matter of law as soon as labor and materials are furnished."

While the foregoing arguments clearly support the legislative policy explicitly stated in section 23 of the Lien Law, and implicit in every such law, that the provisions governing the imposition of such liens should "be construed liberally to secure the beneficial interests and purposes thereof", and that "substantial compliance with its several provisions shall be sufficient for the validity of a lien and to give jurisdiction to the courts to enforce the same", they hardly serve to justify disregard of the constitutionally protected right to procedural due process. As Justice STEWART, speaking for the court in *Fuentes,* pointed out with respect to the Florida and Pennsylvania prejudgment replevin statutes there involved (407 US at

pp 92-93): "The replevin of chattels, as in the present cases, may satisfy a debt or settle a score. But state intervention in a private dispute hardly compares to state action furthering a war effort or protecting the public health." It is not surprising, therefore, that in *Bay State Harness Horse Racing and Breeding Assn. v PPG Inds.* (365 F Supp 1299, 1306, *supra)* and in *Idaho First Nat. Bank v Rogers* (41 US Law Week 2492, *supra),* the courts rejected this argument, declaring that neither the cases before them nor the stautory schemes permitting the attachments or liens revealed any important or significant governmental or societal interest served by the statutes sufficient to justify postponing notice and an opportunity for a hearing before the prejudgment attachment was used. I am in thorough agreement with those views.

Special Term in its memorandum, and the Presiding Justice in his opinion, opine that in *Mitchell v Grant Co.* (416 US 600, *supra)* the Supreme Court apparently limited some of its strictures in *Fuentes* with respect to the need of notice authorizing prejudgment seizures of significant property interests to comply with the procedural due process requirements of the Fourteenth Amendment. Assuming that to be the fact (but, see, the *North Georgia Finishing* case, *supra),* the limitation is not here applicable. In *Mitchell* a majority of the court held valid a Louisiana statute which provided for sequestration where (p 605) " 'one claims the ownership or right to possession of property, or a mortgage, lien, or privilege thereon * * * if it is within the power of the defendant to conceal, dispose of, or waste the property * * * or remove the property from the parish, during the pendency of the action' " (La Code Civ Proc, art 3571). But the writ there, *unlike a notice of lien under our statute,* could issue only when the nature of the claim, the amount thereof and the grounds relied on for the issuance of the writ clearly appeared from specific facts shown by a verified petition or affidavit. *The showing there must be made to a Judge, can issue only upon his authorization and only after the creditor seeking the writ has filed a bond sufficient to protect the vendee against all damages in the event the sequestration is shown to be improvident,* and while the writ is obtainable by the creditor without notice to the debtor or opportunity for a hearing, the statute entitles the debtor *immediately* to seek dissolution of the writ, which must be ordered unless the creditor proves the grounds upon which the writ is issued. The debtor, with or without moving to

dissolve the sequestration, may also regain possession by filing his bond to protect the creditor against interim damage to him should he ultimately win his case.

The Supreme Court, in *Mitchell*, upheld the Louisiana statute on the ground that, unlike the situation in *Sniadach* and *Fuentes, before there could be a prejudgment seizure the party seeking the seizure had to demonstrate to a judicial authority facts to support the extent and validity of his claim and the subject of the seizure had to be given an early opportunity for an expeditious adversary adjudication putting the creditor to his proof.* Justice STEWART, in a dissent in which Justices DOUGLAS and MARSHALL joined, stated that *Mitchell* was constitutionally indistinguishable from *Fuentes* and that "the Court today has simply rejected the reasoning of that case and adopted instead the analysis of the *Fuentes* dissent" (416 US, at p 634). With this view Justice BRENNAN expressed his agreement (p 636). It is noteworthy, in this connection, that thereafter, in *North Georgia Finishing v Di-Chem, Inc.* (419 US 601), in which the court struck down the Georgia garnishment statute which, it said (p 607) "has none of the saving characteristics of the Louisiana statute", citing *Mitchell, Sniadach* and *Fuentes,* Justice STEWART, concurring, declared (p 608): "It is gratifying to note that my report of the demise of *Fuentes v Shevin,* 407 US 67, see *Mitchell v W. T. Grant Co.,* 416 US 600, 629-636 (dissenting opinion), seems to have been greatly exaggerated. Cf. S. Clements, cable from Europe to the Associated Press, quoted in 2 A. Paine, Mark Twain: A Biography 1039 (1912)." In *North Georgia Finishing (supra,* p 608), the Supreme Court said: "It may be that consumers deprived of household appliances will more likely suffer irreparably than corporations deprived of bank accounts, but the probability of irreparable injury in the latter case is sufficiently great so that some procedures are necessary to guard against the risk of initial error. *We are no more inclined now than we have been in the past to distinguish among different kinds of property in applying the Due Process Clause. Fuentes v Shevin,* 407 US, at 89-90" (emphasis supplied).

Applying the standard of *Mitchell, Fuentes* and *North Georgia Finishing* to our laws governing mechanics' and materialmen's liens, I agree with the conclusion reached by the Special Term that the Lien Law "does not meet this standard." But, unlike the Special Term, with which the majority

of this court agrees, I conclude that the statute is fatally defective on due process grounds. In so doing I am not unaware of the presumption of constitutionality which attaches "so as to avoid constitutional doubts" (see *People v Lo Cicero,* 14 NY2d 374, 378; see, also, *Long Is. Trust Co. v Porta Aluminum Corp.,* 44 AD2d 118, 123; *People v Heller,* 33 NY2d 314; *Miller v California,* 413 US 15; *Thompson v Wallin,* 301 NY 476, affd *sub nom Adler v Board of Educ.,* 342 US 485, 496), but I cannot conceive of any basis for holding that our Lien Law statute can be read as requiring compliance with the minimum due process standards set forth in *Mitchell.*

That the Legislature in enacting the statute was aware of the danger of abuse of the summary procedures contained therein is reflected by the fact that section 39 of the Lien Law declares that in any action or proceeding to enforce a mechanic's lien upon a private or public improvement, or in which the validity of the lien is in issue, if the court shall find that a lienor has willfully exaggerated the amount for which he claims a lien, his lien shall be declared void and no recovery shall be permitted thereon. Section 39-a adds an additional sanction by stating that where, in any action or proceeding to enforce a mechanic's lien, the court has declared the lien to be void on account of willful exaggeration, the person filing such notice of lien shall be liable in damages to the owner or contractor and that the damges awarded shall include the amount of any premium for a bond given or interest on money deposited to obtain discharge of the lien reasonable attorney's fees for services in securing the discharge of the lien, plus the difference between the amount claimed to be due and the amount actually due. But all of this can come about only after a trial of the issues, which could take many months or even years.

Furthermore, the Legislature failed to protect lienees against the filing of wholly baseless notices of lien since, while it required that a notice of lien be verified by the lienor, or his agent, it failed to require that " 'the grounds relied upon for the issuance of the writ clearly appear from specific facts' " *(Mitchell v Grant Co.,* 416 US 600, 605, *supra)* and be clearly shown in the verified notice of lien. Rather, section 9 of the Lien Law requires only that the notice of lien state the name and residence of the lienor and of his attorney, if any, the name of the owner of the real property against whose interest therein a lien is claimed, the name of the person by whom the

lienor was employed or the person with whom he contracted, the labor done or materials furnished, the agreed price or value thereof, the amount unpaid, the time when the first and last items of work were done and a description of the property being liened. *There is nowhere a provision for a judicial determination, either prior to or shortly after the imposition of the lien, as to whether the lien has any valid basis,* except where the notice of lien is void on its face (see Lien Law, § 19, subd [6]).

Section 59 of the Lien Law, which deals with "[v]acating of a mechanic's lien; cancellation of bond; return of deposit, by order of court", does provide that a "mechanic's lien notice of which has been filed on real property" may be vacated by an order of a court of record, provided that before such order may be granted, a notice shall be served upon the lienor which "shall require the lienor to commence an action to enforce the lien, within a time specified in the notice, not less than thirty days from the time of service, or show cause at a special term of a court of record, or at a county court, in a county in which the property is situated * * * why the notice of lien * * * should not be vacated". But this merely requires the commencement of an action to enforce the lien, the validity of which cannot be determined until the action is decided. Hence this section fails to meet the *Mitchell* requirement that the lienee be secured an "early opportunity to put the creditor to his proof" (416 US, at p 609) and "immediately have a full hearing on the matter of possession following the execution of the writ, thus cutting to a bare minimum the time of creditor- or court-supervised possession" (p 610).

Like the Supreme Court in *Mitchell,* I am not unaware of the fact that we "must be sensitive to the possible consequences, already foreseen in antiquity, of invalidating this state statute" *(Mitchell v Grant Co., supra,* p 618), but my examination of the various provisions of the Lien Law provides me with no possibility of reading into that Law provisions which save its constitutionality (see *Thompson v Wallin,* 301 NY 476, 494, *supra);* nor can I cull from the record facts to show that in this case there has been no denial of procedural due process to the appellants (see *Long Is. Trust Co. v Porta Aluminum Corp.,* 44 AD2d 118, 123-124, *supra).* Nor can I see any way, as the court did in *Barry Props. v Fick Bros. Roofing Co.* (277 Md 15, 36–39, *supra)* to single out those portions of the Lien Law which lack the safeguards of due process

which *Mitchell* set forth as a condition of constitutionality, and thus salvage portions of the Lien Law sufficient to make it continue to be operable to achieve the goals for which the Legislature enacted it.

To support my conclusion that the Lien Law in its present form violates constitutional standards, I pose this question. If we should substitute for the words "performs labor or furnishes materials", the words, "moneys loaned to the owner of the property", and keep the rest of the statute intact, could anyone reasonably contend that such a provision for an ex parte lien, without judicial oversight, would pass constitutional muster? The answer would seem obvious; but does not the present Lien Law do exactly that?

To argue, as does the majority, that despite "the forceful and well-reasoned arguments to the contrary, as typified by the present dissent", the Lien Law should be upheld because of "the serious consequences which might flow from our invalidation of this statutory rule of longstanding", begs the issue; we are here dealing with a straightforward question of constitutional dimension, and in such a case, as Chief Judge BREITEL has said, "the court has no choice in the performance of its judicial and constitutional function", since its duty "is to determine constitutional issues which sometimes accommodate and sometimes prohibit the facile and sometimes too facile solution of difficult problems" *(Flushing Nat. Bank v Municipal Assistance Corp. for City of N.Y.,* 40 NY2d 731, 739). In any event I do not foresee any really "serious consequences" flowing "from our invalidation of this statutory rule", because the Legislature is now in session and it can readily devise statutory means consistent with the requirements of procedural due process protected by the Fourteenth Amendment to give to contractors, subcontractors, laborers and materialmen the special protection for collection of their claims which it sought to give them in articles 2 and 3 of the Lien Law, while avoiding infringement of the due process rights of owners of property subjected to liens imposed under that law. Under the circumstances, the order appealed from should be reversed and the motion for partial summary judgment dismissing the first cause of action should be granted.

COHALAN and RABIN, JJ., concur with GULOTTA, P. J.; SHAPIRO, J., dissents and votes to reverse the order and grant the motion for partial summary judgment, with an opinion, in which O'CONNOR, J., concurs.

Order of the Supreme Court, Queens County, dated February 6, 1976, affirmed, with $50 costs and disbursements.